340 F.Supp. 213 (1972)
Betty J. URIAN, Plaintiff,
v.
Jack MILSTEAD, Defendant.
No. 71 A 524(3).
United States District Court, E. D. Missouri, Eastern Division.
March 6, 1972.
Moser, Marsalek, Carpenter, Cleary, Jaeckel, Keaney & Brown, St. Louis, Mo., for plaintiff.
Evans & Dixon, St. Louis, Mo., for defendant.

MEMORANDUM AND ORDER
WEBSTER, District Judge.
Plaintiff brings this action as an admiralty and maritime claim to recover against defendant for personal injuries sustained in a fall from defendant's motor cruiser on the Mississippi River.

Facts
On June 13, 1969, plaintiff Betty Urian and her husband, Jos. Urian, were guests of defendant Jack Milstead and his wife aboard defendant's 37-foot cabin cruiser on the Mississippi River. Milstead and Urian were friends, both being pilots for Ozark Air Lines. It was Mrs. Urian's first trip aboard the cruiser. The Urians' two teenage daughters and the Milsteads' two sons were additional passengers. It was a family outing. The boat was a typical river cruiser, with lounge space and a covered pilot house with flying bridge on top, a forward covered cabin with galley and sleeping quarters forward. A covered hatch on the bow permitted access to the bow from the sleeping quarters. A pipe type bow rail two to three feet high followed the horizontal contour of the bow.
The Urians and Milsteads boarded the boat at Commodore Cove, a yacht harbor outside Alton, Illinois at approximately 3:00 P.M. Plaintiff was wearing white *214 shorts and blouse and deck shoes. She and others brought bathing suits, but only defendant's boys actually swam. The boat was kept at a covered dock at Commodore Cove, and the parties entered the boat directly from the dock, requiring no ladder or gangway.
At all times material, defendant was in command of the boat, directed its operation and determined its destination. They cruised on the Mississippi and Alton Lake. After approximately two hours, defendant made a light beach landing on an island maintained for recreational purposes. The beach was approximately 600 yards long with sand about 50 yards in depth. The Urians had brought steaks along, and it was the plan to anchor the cruiser, barbecue the steaks on the sandbar and return to have a picnic supper aboard ship. (The steaks were to be barbecued ashore because the defendant did not want an open flame on his boat.) For this purpose, the boat was brought into light contact with the sandbar, nose in. A bow anchor was dropped and carried up the beach by defendant's wife, who had jumped ashore. The Milstead boys may have left the boat from the stern, as they were swimming. The other members of the party, except plaintiff, left by jumping off the bow into the water approximately six to eight feet below.
Plaintiff had been in the forward cabin passing equipment through the hatch and was the last person aboard. As she prepared to leave the boat, defendant waded into the water and inquired if he could be of help. Plaintiff testified that she had not seen anyone leave, and thus could not have observed the techniques employed in leaving the bow. Plaintiff testified that defendant instructed her to come around outside of the bow rail. There was no ladder there. She testified that she handed defendant her cigarettes and lighter and the lighter dropped into the water. Defendant has no recollection of this incident and denies giving the instructions, but both plaintiff and defendant agree that he offered assistance in getting off the boat. At this point, plaintiff's husband, who was working on the grill saw what was happening and told plaintiff, "Don't you get off the boat." Plaintiff replied that she would wait. The barbecue grill was located eight to ten feet in front of the boat. Plaintiff seated herself on the hatch where she could observe the activity around the grill. She understood that when the steaks were completed the beach party would return aboard the boat.
At some later time, not established, but before the steaks were ready, plaintiff decided to get off the boat. She did not tell anyone else of her plans. She came around the bow rail holding on to the rail with both hands. She lowered herself with the intention of then placing her hands on the deck below and lowering herself further from the deck by her hands and then dropping to the beach below. As she started to lower herself to the deck, her right hand slipped off the rail and struck the deck below. Plaintiff testified that in the process she broke a fingernail, apparently letting go with her left hand, striking her right breast on the deck and dropping the remaining distance to the wet sand below, landing in a sitting position. Plaintiff is five feet six inches. Had she executed her departure according to her own plan, she would have had a drop of but one to two feet to the beach.
Plaintiff testified that she experienced pain and discomfort in the lower back and may have had a momentary blackout. The back of her clothes were dirty and wet. Her husband insisted that she return to the boat. Defendant does not recall any injury to plaintiff's hand but both plaintiff and her husband testified that they were concerned about infection and wanted to use a first aid kit on the boat. A pilot's chair had been taken to the beach previously and this was placed alongside the boat and plaintiff was placed on the chair and boosted back aboard, where she changed clothes. She testified that her left leg hurt while on board the boat and that she had to keep it out straight. Defendant *215 testified that plaintiff did not complain about her condition and that he was then unaware of any injury to plaintiff as a result of the fall.
As previously noted, no gangway or ladder was required to enter the boat at the dock. Defendant apologized at the dock that he had no bow ladder and made several references to the absence of a bow ladder in the course of the cruise. He did have a collapsible ladder used for swimmers and persons coming on board on either afterquarter.
Defendant testified that he had used the same beach for picnicking on previous occasions. With respect to the method of landing, he testified that it would have been impractical to back in because of the danger to the screws. He testified that it would have been possible to bring the stern around without power after light contact had been made with the beach. For this purpose he would have used a stern anchor to pull the stern around and then used the stern ladder for egress. This would have required leaving in a few feet of water. However, this alternate method was not discussed with plaintiff or her husband prior to the accident. Defendant testified that he did not discuss this alternative method with plaintiff because she did not ask to leave the boat and had in fact stated that she would wait on board. (The others were on the beach approximately one-half hour and they were in the area for approximately one hour.) All of the other passengers left the boat without incident. Defendant testified that he simply asked plaintiff if she wanted assistance, at which time her husband issued instructions to stay on board. He does not remember plaintiff asking how to leave the boat, and he testified that he gave no instructions. At the time of the conversation, plaintiff was standing inside the bow rail by the forward stanchion. Plaintiff testified that she had a clear view from the boat to the sand and knew that it was a six to eight foot drop. She felt she could make it, saw no danger and asked for no help.
The Injury. The accident occurred on a Friday. The following Monday, plaintiff saw her physician, Dr. Pranger. She saw him again the following Friday, and that night both legs went into spasms. She called the doctor and was sent to St. John's Mercy Hospital for two shots. The doctor diagnosed a compressed spine and ordered her bedfast flat for one month. She did so and this partially reduced the spasms. She again saw her physician who prescribed in-patient therapy treatment in the hospital. Plaintiff requested out-patient therapy because of her home responsibilities, and this was done. She received traction, deep heat and massage from July to August, 1969. She was placed two times in slight traction under treatment by Dr. Gilbranin. In August, 1969 she saw Dr. Henry E. Lattinville because of some low back and left leg complaints. She was treated at the hospital one time in February, 1970. In April she entered St. John's Hospital for sixteen days where she had a laminectomy for the removal of two discs (L4 and L5). She received further treatment upon her return home and during the months of May through August gradually increased her physical activity. She testified that she was in constant pain and the operation only gave her relief in respect to the spasms she had been experiencing. She started taking relaxants. In the Fall she undertook more therapy at St. John's Hospital. She took steroids without significant help. She consulted other doctors, one in Memphis. Her present condition, according to her testimony, is that she is in constant pain and can perform only limited activities. Prior to the accident, she bowled, played golf, swam, played tennis, did her own housework and enjoyed dancing. Now she cannot bowl or lift heavy objects, she has not attempted golf, was in pain when she tried to dance, can do a limited amount of swimming and minimum housework. There has been no change in the last five to six months.
Prior to the accident, plaintiff had had no prior injury to her lower back or *216 leg. She had experienced neck injury eighteen years before. Plaintiff experienced an accident in 1967 while ice skating. She was treated for a fall on her right shoulder, the low back was not involved and there has been no further medical treatment. Both plaintiff and her husband testified that her marital duties were adversely affected by the boating accident.
Dr. Pranger testified as to her injuries and, based upon her description of her fall, expressed the opinion that the accident is causally related to plaintiff's condition. He testified that she will have a chronic back condition with spurring becoming progressively worse; otherwise the condition is stabilized and may be considered permanent.
At the conclusion of the trial, the court found that plaintiff had established by the preponderance of the evidence that the injuries which she sustained, as disclosed by the record, were the proximate result of her fall from defendant's boat. Plaintiff contends that the fall occurred as a result of the negligence of the defendant in failing to use ordinary care in providing a safe means of ingress and egress from the boat. In the alternative, plaintiff asks the court to apply the admiralty doctrine of comparative negligence in assessing damages should it appear that plaintiff was herself contributorially negligent in the manner in which the fall occurred. Defendant contends that he did not fail to use ordinary care in the facts and circumstances in evidence and asserts successively the alternative affirmative defenses of assumption of risk and contributory negligence.

Conclusions of Law
Jurisdiction is properly founded under 28 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure as an admiralty and maritime claim.
It is undisputed that defendant owed to plaintiff as a person lawfully aboard the vessel the duty of exercising ordinary care, which is held to mean reasonable care under the circumstances of each case. Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959). Under the facts in this case, it was not reasonably foreseeable that plaintiff would undertake to disembark without first advising defendant, her husband or others in the cruise party of her intentions. Plaintiff's husband had intervened at the time defendant offered assistance to the plaintiff and had instructed plaintiff to remain on board. Plaintiff, in the clearest possible terms had said that she "would wait". In circumstances where parties are boarding or debarking from a vessel and such activity may be reasonably anticipated, the defendant has a clear duty to provide a safe means of ingress and egress. Defendant would have been under no duty to provide such means of ingress and egress had the boat been underway in the middle of the Mississippi; and in the court's opinion, defendant had no such duty under the circumstances hereinabove described, where the cruise party was expected to return to the boat within a short time and where plaintiff's husband had indicated his desire that plaintiff remain on board and plaintiff had indicated in the clearest terms her acquiescence and intention to do so. Defendant was under no duty to advise the plaintiff of the alternative method of leaving by the stern after the stern had been brought into the beach, since it was not reasonably foreseeable that she intended to leave the boat at all.[1]
Contributory Negligence. The court is unable to find, based upon the evidence adduced, that the plaintiff was contributorially negligent. She had not observed the others leave the boat, and her plan to lower herself from the guardrail *217 to the deck, and then lower herself until, by hanging from the deck, there would remain only a short distance to the sand was not such lack of ordinary care as to amount to negligence. But by attempting to execute this plan without notifying the others, knowing that they were otherwise occupied and believed that she would remain on board, she assumed the risk.
Assumption of Risk. Plaintiff cites Restatement of the Law, Torts § 496E, which provides:
"(1) A plaintiff does not assume a risk of harm unless he voluntarily accepts the risk.
"(2) The plaintiff's acceptance of a risk is not voluntary if the defendant's tortious conduct has left him no reasonable alternative course of conduct in order to
"(a) aver harm to himself or another, or
"(b) exercise or protect a right or privilege of which the defendant has no right to deprive him."
Plaintiff argues that defendant's tortious conduct left plaintiff no reasonable alternative to her course of conduct. This first assumes that defendant's conduct was tortious in failing to advise of the alternative method of beaching the boat. The court has found otherwise on this point. Second, plaintiff suggests that her conduct was not voluntary because defendant's tortious conduct had left her no reasonable alternative course of conduct. Notwithstanding woman's traditional right to change her mind, there was present in this situation a reasonable alternative course of conduct, which was to remain on the boat as plaintiff said she would do. There were no hidden defects, no obscured dangers. She could see and judge the distance, she was under no compulsion to leave the boat, and in fact had been told to remain on board.
Conclusion. That plaintiff was severely injured by her fall, there can be no doubt. But the court finds and concludes that plaintiff has failed to establish, by the preponderance of the evidence, that defendant failed in his duty to exercise reasonable care under the circumstances and that such failure caused the accident. Even if defendant's conduct or omission amounted to negligence, which this court holds it did not, plaintiff would not be entitled to recover for the reason that she by her own conduct and under the facts and circumstances in evidence, assumed the risk of harm, thereby providing a full defense to the claim of negligence.
Accordingly, the Clerk is hereby ordered to enter a verdict for defendant and against plaintiff. Costs will be assessed against the plaintiff.
So ordered.
NOTES
[1] An entirely different result might have obtained had plaintiff left the boat by the bow under the direction or with the knowledge of defendant, not having been advised of the alternate available route.